# Todd *v.* Flournoy's Heirs and Adm'r.

### *Bill in Equity for Specific Performance of Contract for Sale of Decedent's Lands under Probate Decree.*

1. *Special statutes for conversion or sale of property belonging to minors, estates of deceased persons, &c.*—Where certain persons are, on account of defect of understanding, immaturity, or other legal disability, by law held to be incapable of disposing of their property, and, by reason of supervening circumstances, are prevented from having as beneficial use of it,· in its existing shape or condition, as the donors or grantors intended they should have ; and in consequence of the trusts, limitations, or other provisions attending the gift or grant, the courts can not afford relief ; in such case, the legislature may interpose by a special statute, and authorize a conversion or disposition of the property for their benefit, in any manner in which they, if *sui juris*, might convert or dispose of it. But, in the enactment and construction of such special laws, the line which separates the legislative and the judicial departments of the government should be kept distinctly in view.

2. *Sale of decedent's lands for distribution; jurisdiction of Probate Court under special statute.*—Where a private statute confers on the Probate Court of a particular county jurisdiction to order a sale or distribution of lands belonging to a testator's estate, on the filing of a petition by any of the parties interested in it, "setting forth the necessity of a sale or distribution," "and that it would be for the interest of all parties entitled to share in said estate to have the same sold, and the proceeds re-invested, or distributed, or to have the property distributed ;" the word *necessity* means only a strong or urgent reason, and a petition which avers "that it is greatly to the interest of said legatees, and of all parties entitled to a share in said estate, to have a sale of the real and personal property, so that each of the parties interested may have the share to which he or she may be entitled under said will," and "that the keeping of said estate together and working it is productive of no benefit to the parties interested, or very little, compared to the accumulation which the funds from the proceeds of a sale of said estate would realize to them respectively,"— though defective on demurrer, is sufficient to give the court jurisdiction.

3. *Same.*—Where the statute declares that, on the filing of a proper petition, all the parties interested being before the court, "the said probate judge shall be, and he is hereby, invested with all the jurisdiction which a Chancery Court could exercise, on a bill regularly filed in such Chancery Court, to accomplish the objects prayed for by such petition ;" the Probate Court becomes, *pro hac vice*, a special Chancery Court, and is invested with all the powers of a Chancery Court, but no more ; and its decree of sale, rendered on a petition which is sufficient to give it jurisdiction, can not be collaterally impeached, on account of errors or irregularities which might reverse it on error or appeal.

4. *Same; jurisdiction of equity to decree, in violation of will.*—The weight of authority is against the existence of any power in a court of equity, in the absence of legislation, to decree a sale of· lands at the instance of the parties interested, when such sale is in direct violation of the terms of the will under which they hold it; yet, when the jurisdiction of the court has attached, on a bill regularly filed, all the proper parties being before the court, its decree of sale can not be collaterally impeached, but is conclusive until reversed or set aside.

5. *Same; making conveyance to purchaser.*—Where the Probate Court, proceeding under such special statute, on a proper petition, has decreed a sale,

and confirmed the report of the sale, but has not ordered a deed to be made to the purchaser, it has the power to do so, at his instance, notwithstanding the lapse of more than twelve years from the sale ; and if no conflicting rights have accrued to third persons, it is the proper forum in which the proceeding should be thus completed. But, if the purchaser has sold and conveyed to a third person, and the original notes for the purchase-money, being partly unpaid, are claimed by different persons, the sub-purchaser may come into equity, against the devisees, personal representative, and transferree of the notes, to compel a conveyance, and determine their conflicting rights to the unpaid purchase-money.

6. *Same; purchase-money, or notes, how disposed of.*—When lands are sold by the Probate Court, under authority conferred by a special statute, for the purpose of distribution among several devisees, the proceeds of sale should not go into the general course of administration, but should be brought into court for distribution among the parties interested ; and although the sale is conducted by the administrator, under the order of the court, and the notes for the purchase-money are taken payable to him as administrator, he acts simply as an agent or commissioner of the court, and has no authority to transfer one of the notes in payment of a debt against the estate.

7. *Conclusiveness of chancery decree in bar of another suit.*—A decree in chancery, dismissing, for want of equity, a bill filed by a purchaser of lands at a sale made by an order of the Probate Court, against the personal representative and heirs, to compel a specific performance of the contract, and the execution of a conveyance, does not conclude a sub-purchaser, to whom he had sold and conveyed all his interest in the land before filing his bill, from maintaining another suit for the same purpose.

APPEAL from the Chancery Court of Chambers.

Heard before the Hon. B. B. McCRAW.

The bill in this case was filed on the 3d June, 1873, by Matilda G. Todd, a *femme sole,* against the personal repre-·sentative and surviving children and heirs of Marcus A. Flournoy, deceased, who were also devisees under his will, and against Jesse B. Todd and Thomas L. Penn ; and sought, principally, to compel a conveyance to the complainant of the legal title to a tract of land in Chambers county, which she had bought from said Jesse B. Todd, and which he had previously bought at a sale made by Thomas F. Flournoy, administrator of said Marcus A. Flournoy, under an order and decree of the Probate Court of said county, as hereinafter more particularly stated. The tract of land contained twelve hundred and eighty acres, and belonged to said Marcus A. Flournoy at the time of his death, which occurred in April, 1849. The said Marcus was possessed of a valuable estate, consisting of said plantation, slaves, and other property ; and he left a large family, composed of his second wife and several children by her, and several adult children by his first wife. His last will and testament was duly admitted to probate in said county shortly after his death, of which his wife was appointed executrix, with Patrick Jarvis and John Kennedy as executors. After devising his dwelling-house to his wife, during her life or widow-

hood, and several slaves as house-servants, and making specific bequests of slaves to each of his adult children, by the ninth clause of his will he bequeathed the residue of his personal estate to his wife and her five children, and provided that each of the children, on attaining majority, should be entitled to demand and receive his or her distributive share of said property. The tenth clause was in these words : " It is my will and desire, that my plantation, and all my real estate, shall remain unsold, except so far as I have otherwise directed in relation to my dwelling-house, until my youngest child living at the time of my decease shall become of full age in law; and that all my negroes, not heretofore disposed of in this my will, my stock of cattle, hogs, horses, mules, and every other description of property not heretofore bequeathed to my wife, Eliza A. Flournoy, shall be kept together on my said plantation, for the purpose of raising the young negroes, and for cultivating said plantation for the use, support, and maintenance of my wife and family, and the education of my children ; and should there be any surplus left from the proceeds of .the crops made thereon, after defraying the expenses of the same, and meeting the purposes aforesaid, it is my will and desire that the said surplus be invested in either land or negroes, or loaned out at interest by my executors, as to them may seem best for the interest of my wife and children. Provided always, however, that nothing contained herein should be construed or understood to prohibit or prevent any of my children, who are entitled to the same, from demanding and receiving their proportionate share of my estate, upon his or her arriving at full age, as provided for in the immediate preceding clause of this my will; and provided, also, that in the event of my wife again marrying after my decease, she shall also be entitled to demand and receive her proportionate share of my estate, in the manner hereinbefore provided for my children when any of them shall become of full age in law." The eleventh clause directed, that the proceeds of his real estate, when sold, should be equally divided among all his children.

On the 21st February, 1860, an act was passed by the legislature, and approved on that day, entitled " An act for the relief of the legatees of Marcus A. Flournoy, deceased," in the following words : " SECTION 1. *Be it enacted,*" &c., " That upon the petition of any of the legatees of Marcus A. Flournoy, late of Chambers county, deceased, made to the Probate Court of said county, setting forth the necessity of a sale or distribution of all or any portion of the estate of said Flournoy, and that it would be for the interest of all

parties entitled to share in said estate to have the same sold, and the proceeds reinvested or distributed, or to have the property distributed ; all parties in interest being made parties to said petition, either as plaintiffs or defendants, and having due notice thereof; said probate judge shall be, and he is hereby, invested with all the jurisdiction which a Chancery Court could exercise, on a bill regularly filed in such Chancery Court, to accomplish the objects prayed for by such petition."—Session Acts 1859–60, p. 620. Under this special statute, a petition was filed in the Probate Court of Chambers, on the 16th October, 1860, by six adult children of said testator, including two married daughters, whose husbands joined with them in the petition, asking a sale of the property then belonging to the estate. The petitioners averred that the only persons interested in the estate, in addition to themselves, were Marcus A. Flournoy, Augustus Flournoy, and Adam Flournoy, whose ages, respectively, were twenty, eighteen, and twelve years, and whose residences in Georgia were stated; and the petition asked that they might be made parties, and that guardians *ad litem* might be appointed to represent them. The petition contained the following averments, as showing a necessity for the sale: "Your petitioners aver, that it is greatly to the interest of said legatees, and of all parties entitled to a share in the estate of Marcus A. Flournoy, deceased, to have a sale of the real and personal property of said Marcus A. Flournoy, so that each of the parties interested therein might have the share to which he or she may be entitled under said will; that the keeping of said estate together, and working it, is productive of no benefit to the parties interested, or very little, compared to the accumulation which the funds from the proceeds of a sale of said estate would realize to them respectively ; and this they can abundantly prove to your honor's satisfaction." A copy of the will was made an exhibit to the petition, which also referred to the special statute above copied as authorizing a sale, and prayed that the court would "decree a sale of said estate to be made, upon such terms as shall appear most beneficial to all the parties interested; the purchaser thereof to be invested with a good and valid title to the same, upon complying with the terms of said sale," &c.

On the 10th December, 1860, the Probate Court rendered the following decree on the petition: "This being the day appointed for hearing the application of Thomas F. Flournoy, Mary Ann Caldwell and her husband, Groves Caldwell, George M. Flournoy, William M. Flournoy, Eliza E. Harris and her husband, O. F. Harris, and Robert W. Flournoy,

legatees of the last will and testament of Marcus A. Flournoy, deceased, praying an order of sale of all the real and personal property of said estate for distribution, upon the ground that it would be for the interest of all parties entitled to share in said estate to have the same sold and distributed; and Adam Flournoy, who is a non-resident of this State, having been brought into court by publication in a newspaper published in this county, in all respects strictly according to the order of this court, made and entered in the premises on the 16th day of October, 1860; now come the said applicants by their attorney, and move the court that said application be granted; and also comes Elliott H. Muse, who was heretofore appointed and has consented to act as guardian *ad litem*, to represent and protect the interests of Augustus F., Marcus A., and Adam Flournoy, minors, who are interested in this proceeding, and said guardian *ad litem* having filed his answer in writing, denying the allegations contained in said application; and the said Augustus F. and Marcus A. having had notice, strictly and in all respects in accordance with the order of this court, made and entered in this proceeding on the 16th day of October, 1860, as is now shown to the satisfaction of the court; and it appearing to the satisfaction of the court, by competent proof, that the statements of said application are true, and that it would be to the interest of all parties entitled to share in said estate, when all of the estate, both real and personal, of said Marcus A. Flournoy, deceased, is sold for distribution: It is therefore ordered, adjudged, and decreed by the court, that the real and personal property belonging to said estate, and now kept together under the will of said Marcus A. Flournoy, which is described and set forth in the schedule attached to said application, and any other property belonging to said estate so kept together under said will, and not set forth in said schedule, be sold, by and under the direction of said Thomas F. Flournoy, administrator *de bonis non* with the will annexed of the estate of said Marcus A. Flournoy, deceased; said sale to be made at the late residence of said deceased in this county, on the 15th day of January, 1861, and from day to day thereafter until said sale is completed; after having first given notice of the time, place, and terms of sale, with description of the property, in the *Chambers Tribune*, a newspaper published in the county, and upon the following terms—the lands to be sold on credit of one and two years, half and half; all the personal property, except slaves, on a credit of twelve months; and the slaves to be sold for one-fifth cash, and the balance on a credit of twelve months; the credit payments to be secured by notes, payable to said

administrator, with at least two good and sufficient sureties. It is further ordered, that said Thomas F. Flournoy report to this court an account of said sale within sixty days thereafter. It is further ordered, that said application, and all papers on file relating to this proceeding, be recorded."

The sale was made, pursuant to the terms of this decree, on the 15th January, 1861; and J. B. Todd became the purchaser of the lands in controversy, at the price of $4.11 per acre, making in the aggregate $5,260.80; and he received from the administrator a certificate, stating these facts, and that "he, said Todd, has complied with the terms of said sale, by giving notes, with security, payable one and two years after date." The administrator made a report of the sale, under oath, on the 21st January, 1861; and the court thereupon "ordered, that the same be recorded." Said Todd took possession of the lands under his purchase, and held them until the 11th day of February, 1870, when he sold and conveyed them, with covenants of warranty, to Mrs. Matilda G. Todd, the complainant in this cause; and she thereupon entered into possession, and continued in the peaceable possession, through the said J. B. Todd as her tenant, until the 1st January, 1873, when they were recovered from her in an action at law, by Samuel Spence, one of the defendants, who had been appointed administrator *de bonis non* of said decedent's estate on the 5th June, 1871.

The foregoing facts were alleged in the bill, and shown by the several exhibits attached to it. The bill further alleged, that J. B. Todd paid the first of his notes for the purchase-money to the said Thomas F. Flournoy, the administrator, and had made a partial payment on the second, which said administrator had transferred to Thomas L. Penn, one of the defendants, in payment of supplies furnished by him to the family of the deceased while they were kept together and supported under the provisions of his will; that the balance due on this note, at the filing of the bill, was $539.40, which had not been paid, because Adam Flournoy, one of the minors, threatened to repudiate the sale when he became of age, and to have the sale and the transfer of the note to Penn set aside; that the dispute about the title to the land and the transfer of the note, and the non-residence of some of the heirs, rendering it impracticable to tender a deed to them to be executed, had prevented said J. B. Todd and the complainant, respectively, from tendering payment of the note in full to them and said Penn, and demanding a deed for the land; that the complainant was able, ready, and willing to pay the balance due on said note, with interest, to the person who might be entitled to receive it, or, if the

court should decide that the partial payments already made to Penn were unauthorized, then she would pay the whole amount of the note, with interest, "and she hereby offers and proposes to pay the same to the said Penn, or to whomsoever the court may decree it to be paid, and to stand by and abide whatever decree the court may render in the premises."

The bill alleged, also, that in August, 1866, George, William, and Adam Flournoy, the latter being then an infant, and suing by his guardian, filed a petition in said Probate Court of Chambers county, to compel a final settlement of the administration of said Thomas F. Flournoy; that a final settlement was made, under the petition, on the 28th January, 1867, in which said administrator was charged, among other things, with the entire amount of the notes for the purchase-money given by said J. B. Todd, and decrees were rendered against him, in favor of the respective heirs and legatees, for their distributive shares of the estate, including the purchase-money of the lands, and "each has received and enjoyed the same;" and that all the heirs and legatees knew, when this settlement was made, that the second note had been transferred to Penn, and was held by him. The bill prayed a reference and account, to ascertain the amount of the purchase-money due and unpaid; that the court would determine to whom the money should be paid, and would require a good and legal title to the land to be made to the complainant, on her paying the amount thus ascertained to be due; that she might be placed in possession of the land, and established in her right to it against any claim on the part of the defendants; also, for an account of the rents of the land during the time it was detained from her, and for general relief.

A demurrer to the bill was filed by all the defendants jointly, except J. B. Todd, Thomas L. Penn, and Thomas F. Flournoy, assigning the following (with other) grounds of demurrer: 1st, that the special act of the legislature was unconstitutional and void; 2d, that the sale of the lands was void, because contrary to the express provisions of the testator's will, and because the court had no jurisdiction to order it; 3d, that no proof was taken by depositions, as in chancery cases, to show a necessity for the sale; 4th, that the sale was never confirmed, and the purchase-money was never paid; 5th, that more than eleven years had elapsed since the sale was made; and, 6th, that complainant had an adequate remedy at law. Said defendants also filed a plea in bar, averring that, on the 20th December, 1872, said J. B. Todd had filed a bill in said court against them and others,

stating therein the same facts as were alleged in the bill in this case, and praying the specific performance of the said contract of sale; and that said bill was dismissed, on demurrer, for want of equity, in May, 1873. To this plea the complainant demurred. The cause being submitted to the chancellor on the demurrer, plea, and demurrer thereto, and on motion to dismiss the bill for want of equity, he sustained the motion, and dismissed the bill, for want of equity, *at the costs of the complainant's next friend;* and his decree is now assigned as error.

W. H. DENSON, for the appellant.

MAY & RICHARDS, *contra.* (No briefs on file.)

MANNING, J.—Marcus A. Flournoy died in April, 1849, in Chambers county, leaving a plantation, slaves and other property therein, and a second wife and several children by her and by a former wife surviving him, and a last will and testament. After divers legacies given chiefly to his older set of children, by the tenth clause of his will, he required the plantation, embracing the lands in controversy in this cause, with the slaves not disposed of, cattle, hogs, &c., thereon, to be kept together and the land to be cultivated (according to the words of the will) "until my youngest child living at the time of my decease shall become of full age in law, * * * * for the use, support and maintenance of my wife and family, and the education of my children;" and he directed that any surplus of the income should be invested in land, or slaves, or be lent out upon interest by his executors, as to them should seem best for the interest of his wife and children; but that this should not be construed to prevent any of his children mentioned in the ninth clause of the will, not including some of the older ones, from demanding and receiving their respective shares of the personal estate, according to said clause, when they should severally arrive at full age. By the eleventh clause of his will he required the proceeds of his real estate, when sold, to be divided equally among all his children; and he appointed his wife and Patrick Jarvis and John Kennedy executors.

In February, 1860, the widow of testator having died, we presume (for she is not mentioned as having then or thenceforth any interest in the transactions), an "Act for the relief of the legatees of Marcus A. Flournoy, deceased," was passed by the legislature, enacting: "That upon the petition of any of the legatees of Marcus A. Flournoy, deceased, late of Chambers county, made to the Probate Court of said county, setting forth the necessity of a sale or distribution of all or

any portion of the estate of said Flournoy, and that it would be for the interest of all parties entitled to share in said estate to have the same sold and proceeds reinvested or distributed, or to have the property distributed, all parties in interest being made parties to said petition, either as plaintiffs or defendants, and having due notice thereof, said probate judge shall be and he is hereby invested with all the jurisdiction which a Chancery Court could exercise on a bill regularly filed in such Chancery Court to accomplish the objects prayed for by such petition."—(Acts of 1859–60, page 620.)

Six of the children of the testator, including two married daughters and the husbands of these married daughters, filed their petition under this act for a sale of the property of the deceased, including the 1280 acres of land in controversy, in Chambers Probate Court, averring that the only other persons besides petitioners interested in the estate of testator, were his sons, Marcus A. Flournoy, then twenty-one years old, Augustus Flournoy, eighteen years old, and Adam Flournoy, then twelve years old, of whom the last named resided in Georgia; and petitioners prayed to have these minors made parties defendant, and that guardians *ad litem* be appointed for them, &c. The principal prayer of the petition was, that the court would decree a sale of the estate on such terms as to it should seem most beneficial; "the purchaser thereof to be invested with a good and valid title to the same upon complying with the terms of said sale."

The court, on the 10th of December, 1860, in a decree, reciting that the petitioners came by their attorney, and that Adam had been "brought into court by publication in a newspaper" of the county according to an order of the court made on the 16th of October before, and that Augustus and Marcus had received notice strictly according to an order of the court made on the same day, and that Elliott H. Muse, who had previously been appointed by the court and had consented to act as guardian *ad litem* for the three minors, came and filed answer for them, denying the allegations of the petition; and that it appeared to the court, "by competent proof, that the statements of the said application [were] true, and that it would be for the interest of all the parties entitled to share in said estate," thereupon ordered a sale of the property real and personal set forth in the schedule, to be made on the premises, January 15th, 1861, after notice, &c., under the direction of Thomas F. Flournoy, administrator *de bonis non*, with the will annexed; * * * the lands to be sold on credit of one and two years, half and half, all the personal property except slaves on a credit of twelve

months, and the slaves to be sold for one-fifth cash and the balance on a credit of twelve months, the credit payments to be secured by notes payable to said administrator with at least two good sufficient securities." The decree further required that Thomas F. Flournoy report an account of the sale within sixty days. This sale was made the 15th of January, 1861; and the 1280 acres of land were sold to one Jesse B. Todd, at $4 11-100 an acre, making $5,260 80-100; of which sale Flournoy gave a certificate of that date to him, stating further that Todd had "complied with the terms of sale by giving his notes with security, payable one and two years after date." The report of sale of the personal property is not set out, "the land being alone in issue in this case," as a postscript in the exhibit says. January 21st, 1861, the minutes of the Probate Court show that Flournoy made "report in writing, and under oath, of the sale of the property of said estate, sold by him under and by the order of this court," and that it was ordered that the same be recorded.

On the 11th of January, 1870, J. B. Todd, who purchased the land, conveyed it with warranty to complainant, *Matilda G. Todd.* She filed this bill June 3d, 1873, against all the children and heirs aforesaid of Marcus A. Flournoy, deceased, except Marcus A., junior, and Augustus S., who (as it alleges) died intestate, without issue, and unmarried, leaving as their heirs their brothers and sisters aforesaid, and their interests in the said lands free from liability for any debts; and against Samuel Spence, administrator *de bonis non* of the estate of Marcus A. Flournoy, and Jesse B. Todd, complainant's vendor, and one Thomas L. Penn, sen'r, as defendants.

The bill alleges the premises, and that Jesse B. Todd took and had possession of the lands from the date of the sale to him, January 15th, 1861, to the date, June 3d, 1871, of his conveyance to complainant, and that she thereafter was in possession by her tenant, said Jesse, until January, 1873, when they were recovered of her by said Samuel Spence as administrator *de bonis non* of Flournoy, by an action of trespass to try titles; that said Jesse paid the first of the two notes he gave for said lands, to Thomas F. Flournoy; that said Thomas transferred the other of said notes, soon after the sale, to said Thomas L. Penn, in payment for supplies furnished by Penn to keep up the family of Marcus A. Flournoy, deceased, under his will; that said Jesse has paid to Penn upon this latter note $2,091, and owes only a balance of $539 40-100 on it; that he was hindered from paying this by the claim to the property made by Adam Flournoy, who threatened when he became of age to repudiate the sale of

the land, and have it and the transfer of the note by said Thomas set aside; that the disputes about the title to the land and the right of Penn to receive payment of the note, and the inability to tender a deed to the heirs of Flournoy, some of whom, and among them Thomas F. since 1867, resided out of the State, prevented said Jesse, or complainant, from tendering payment of the note in full to them and said Penn, upon their executing such deed; that complainant is ready, willing and able to pay the balance due on said note to whomsoever is entitled to receive it, or to pay the original amount thereof and interest, if the court shall be of opinion she is bound so to do; and that she is willing and offers to abide by the decree of the court, and prays that it will order and adjudge that the title to said land be conveyed to complainant, and that she be put in possession thereof, upon paying the balance of the price aforesaid as the court may direct. The bill charges further, that in August, 1866, George and William and Adam Flournoy, the latter by his guardian, one Holliday, petitioned the Probate Court to bring Thomas F. Flournoy to a final settlement of his administration; that such final settlement was effected January 28th, 1867; that said Thomas was charged therein, among other things, with the total amount of the notes given for the land; that decrees upon such settlement were rendered against him in favor of the several legatees and heirs of said Marcus A., deceased, for their respective shares of said estate, including the purchase-money of said lands, and that "each has received and enjoyed the same." The exhibit referred to as showing such final settlement, is not, however, in the record. Also, it is alleged, that the heirs who petitioned the Probate Court for the sale of the land, were all of age when they filed the petition; and that all of the heirs and legatees knew, at the time of the final settlement, that the second land note had been transferred to and was held by defendant Penn.

Pleas and demurrers were filed to the bill of complaint; and, upon motion, it was dismissed by the chancellor for want of equity.

It is insisted for appellees, that the act of the legislature of February, 1860, relating to a sale of the estate of the testator, Flournoy, is in violation of the constitution, and void. Special statutes, authorizing the sale of property of estates of deceased persons, or of minors, or in the hands of trustees, or making provisions intended to facilitate the disposal or conversion of such property, are numerous. Of course, they have taken many different shapes, and have been the occasion of many (not entirely harmonious) judicial decisions. Indeed, they are frequently the cause of much perplexity to

courts. Generally, such legislation is assailed as an invasion of the province of the judiciary; sometimes, as violating the provision that no person shall be deprived of his property but by due process of law, or according to the law of the land.

Judge Cooley has discussed the subject, in his invaluable work on Constitutional Limitations. He says the rule deduced from the authorities seems to be this: "If the party standing in position of trustee applies for permission to make the sale, for a purpose apparently for the interest of the *cestui que trust*, and there are no interests to be considered and adjudicated, the case is not one that requires judicial action, but it is optional with the legislature to grant relief by statute, or to refer the case to the courts for consideration, according as the one course or the other, on considerations of policy, may seem desirable."—(p. 98). Cases in Massachusetts, New York, Ohio, and other States, are reviewed by the author; which leads him to say further: "This species of legislation may, perhaps, be properly called prerogative remedial legislation. It hears and determines no rights. It deprives no one of his property. It simply authorizes one's real estate to be turned into personal, on the application of the person representing his interest, and in such circumstances that the consent of the owner, if capable of giving it, would be presumed." In Ohio, a statute was held valid, which authorized commissioners to make sale of lands, held in fee tail by minor devisees under a will, in order to cut off the entailment, and effect a partition between them; the statute being applied for, on behalf of the devisees, by their mother and the executor of the will.—*Carroll v. Lessee of Olmstead*, 16 Ohio, 251.

In Massachusetts, previously, a special act of the legislature authorized a father, as guardian of his minor children, to whom land had descended from their mother, to sell and convey it, and put the proceeds at interest, on good security, for their benefit, he giving bond to the judge of probate for his fidelity. The sale having been made, the children, when they became of age, repudiated it, on the ground that the statute was void. The Supreme Judicial Court of that State held that it was "necessary for the interest of those who, by the general rules of law, are incapacitated from disposing of their property, that a power should exist somewhere of converting lands into money;" that in that commonwealth, "this power must rest in the legislature, that body being alone competent to act as the general guardian and protector of those who are disabled to act for themselves;" and that, in exercising that power for one not *sui juris*, the legislature "is

in fact protecting him in his property, * * * and enabling him to derive subsistence, comfort and education from property which might otherwise be wholly useless, during that period of life when it might be most beneficially employed."—*Rice v. Parkman,* 16 Mass. 326. And in New York, it was held, that "it is clearly within the powers of the legislature, as *parens patriæ,* to prescribe such rules and regulations as it may deem proper, for the superintendence, disposition, and management of the property and effects of infants, lunatics, and other persons who are incapable of managing their own affairs."—*Cochran v. Van Swilay,* 20 Wend. 373. See, also, *Leggett v. Hunter,* 19 N. Y. 445; *Estep v. Hutchman,* 14 Serg. & R. 435; *Stewart v. Griffith,* 33 Mo. 13. In *Peto v. Gardner* (2 Yo. & Coll. 312), the vice-chancellor, approving an arrangement which would change the nature of interests held under a will, and which he considered he had not the power to effectuate,—in order to enable the parties to get an act of parliament to authorize it, declared that in his opinion it would be beneficial.

The bottom idea in this class of cases seems to be this: Where, by the law of the land, the provisions of which depend on the legislature, certain persons, because of defect of understanding, immaturity, or some legal disability, are held to be incapable of disposing of their property, and, by reason of supervening circumstances, are hindered from having as beneficial use of it, in its existing shape or condition, as the donors or grantors intended they should have; and in consequence of the trusts, limitations, or other provisions attending the gift or grant of it, the courts can not afford relief; in such cases, the legislature, representing the State, the general guardian of all, may justly interpose by a special enactment, and authorize the property to be disposed of, or converted, for the benefit of such persons, provided they themselves might so dispose of it, if *sui juris.* We do not intend to say that the principle underlying such legislation has no greater breadth than this. Many cases go beyond it, as thus qualified; and some similar special acts are founded on a different consideration, such as those that authorize a sale of property to pay debts with which it is chargeable. Of this character, was the statute held to be valid in *Holman's Heirs v. Bank of Norfolk,* 12 Ala. 369; and *Watkins' Heirs v. Holman's Lessee,* 16 Peters, 25. See, also, *Wilkinson v. Leland,* 2 Peters, 260; *Florentine v. Barton,* 2 Wall. 210. The case before us does not require us to investigate the questions arising in cases of this and other classes. They are numerous, and not all in harmony; and some of them tend to make obscure and indefinite the line between the legitimate

power of the legislature and the jurisdiction of the courts; a line which should be kept as distinct as possible, in order that persons belonging to one of these two departments of government may be enabled the better to observe the command in the constitution that forbids them from exercising any powers properly belonging to the other.  For this reason, and for the purpose of preventing the expensive and embarrassing litigation, and the doubts about titles that arise out of such legislation, it is desirable that the limits, in this direction of the law-making power, should not be indefinitely enlarged.

The special statute on which this case rests, is within the principle as stated above, and, therefore, is not void.  The petition, filed under it in 1860, was signed by all the adult legatees of the testator, discloses that the minors were scattered, two of them being in Macon county, and the youngest in Georgia, and makes no mention of their mother, who was also a legatee, and who, we therefore suppose, was not then living.  Some of those mentioned in the ninth clause of the will seem to have arrived at full age, and, we suppose, had drawn, as they were entitled to do, their shares of the slaves and other personal property used on the plantation to make it productive.  If so, this would probably leave a large tract of land, kept together by will until the youngest child should become of full age, without adequate means for the tilling of it, and chargeable with taxes; a condition which might make it highly advantageous, as the petition alleged, to all concerned, the minors as well as the rest, that the estate should then be converted into money, and the proceeds be reinvested or distributed.  At least, it was made to appear that this would be so to the legislature, who had authority to decide the question and make the enactment.  It did not undertake to deprive any of the legatees of the share or interest given to him by the will, but only looked to a change, or conversion, of the subject in which such interest existed.  If the General Assembly had the power to authorize this to be done by commissioners, or a guardian, or trustee, it had the power to authorize a court, designated by it, to inquire into and act upon the subject.  In many of the instances in which such statutes have been passed, some duty or office in carrying them into execution has been imposed on courts of the same kind as this Court of Probate.

But a Court of Probate, being one of special and limited jurisdiction, could exercise the authority conferred by this statute, only upon the condition that there was a compliance with the requisitions prescribed as preliminary thereto. The record must show the existence of the things upon

which its jurisdiction depended. What were they? *First*, a petition should be filed in the Probate Court, by some one or more of the legatees of testator Flournoy. This was done; and the petitioners were all who were of mature age. *Second*, all the parties in interest must be made parties, plaintiff or defendant, and have notice of the proceeding. The record shows that this was done. *Third*, the petition' must set forth the necessity of a sale or distribution of all or a portion of the estate, and that it would be to the interest of all the parties to have the same sold, and the proceeds re-invested or distributed, or to have the property distributed. The petition avers "that it is greatly to the interest of said legatees, and of all parties entitled to a share in the estate of Marcus A. Flournoy, deceased, to have a sale of the real and personal property of said Marcus A. Flournoy, so that each of the parties interested may have the share to which he or she may be entitled under said will; that the keeping of said estate together, and working it, is productive of no benefit to the parties interested, or very little, compared to the accumulation which the funds from the proceeds of a sale of said estate would realize to them respectively," &c. Tested by a demurrer, this would be very defective. The petition does not set forth the facts that cause a necessity for the sale of the property; the circumstances, events, changes of condition, or other palpable things, which might be proved by evidence, and ought, in such a case, to be alleged, to make good the pleading. (See *Ex parte Jewett*, 16 Ala. 409.) But this is not now the subject of inquiry. The question is, was jurisdiction of the cause acquired by the court? In our opinion, it was. The word "necessity," in the statute, is not used in an absolute sense. Its meaning varies according to the subject and connection. In this act, it means only a strong or urgent reason why the thing proposed should be done. In this sense, the petition sets forth a necessity for the sale of the property, to-wit: that in its present condition the property is of no advantage to its owners, or very little, compared to the benefit they would derive from having it converted into money, and the funds invested for accumulation; and it sets forth that the interest of all would be thereby promoted. The jurisdictional averments are sufficient, notwithstanding the defects of the petition as a pleading. The petition sets out, also, as an exhibit, the will of testator Flournoy, showing the disposition he made of his property, and some other things, and refers particularly to the act under which it is filed.

The next inquiry is: what power had the Probate Court, when it obtained jurisdiction? It was "invested with all the

[Todd v. Flournoy's Heirs and Adm'r.]

jurisdiction which a Chancery Court could exercise, on a bill regularly filed in such Chancery Court, to accomplish the objects prayed for by such petition." This, appellant insists, means that the Probate Court is clothed with power to cause the land to be sold, whether a Court of Chancery had such power or not, but must proceed according to the practice and methods of the Chancery Court. We do not so understand the statute. Let the words be transposed, and the meaning is not changed. The Probate Court "is invested with all the jurisdiction to accomplish the objects prayed for by such petition, which a Chancery Court could exercise on a bill regularly filed in such Chancery Court." *Pro hac vice*, the Probate Court is a Court of Chancery, with all its power, and no more, to accomplish the objects prayed for by the petition.

Had that court the power to set aside the express provisions and arrangements made by testator for the benefit of his minor children, by causing the plantation, &c., which the will ordered to be kept up and worked, for the benefit of his younger children, until the youngest should become of age, to be converted into money? In such a case, the weight of authority is against the existence of the power in a court of equity, unless it be given by legislation. Of its control over a ward's estate, it is said in Adams' Equity (marg. p. 284): "In cases where a trust exists, the degree of authority, as well as the manner of its exercise, will depend on the terms of the instrument creating it. In *other cases*, the court is thrown on its inherent jurisdiction, and has authority to manage the estate during minority, and to apply its proceeds for the infant's benefit; but there is no inherent power to dispose of or alter the estate itself, except in cases of election or partition, where the disposition is demandable as of right by other parties, and [or] of the devolution on an infant of a mortgaged estate, where a sale is the only protection against foreclosure." Perhaps, the latter part of this passage may not be law in this country.—See *Ex parte Jewett*, 16 Ala. 409; *Baker v. Lorillard*, 4 Comst. 257. It is immaterial, however, in this case, whether it be true or not. The Court of Probate being invested with jurisdiction in the cause, whatever decree it rendered in the premises is just as valid as it would have been if rendered by a court of equity. It cannot be collaterally impeached. However full of error it may be, it must stand as the law of the case, until reversed, or set aside, upon an appeal, or by some direct proceeding; and this, the lapse of time has, in the present instance, barred.

But that court did not finish the work it undertook to do.

Though it, in effect, confirmed the sale made under its decree (*Worthington v. McRoberts*, 9 Ala. 297), it has not ordered a conveyance of the property, or refused to do so. The title was not conveyed to the purchaser. Nor was the authority of the Probate Court over the case exhausted. *Quoad hoc*, it is still a court of chancery. And if the controversy were now between the original purchaser at the sale, and the devisees of testator, and no one else, and another equity had not intervened, the Probate Court would still be the forum in which the questions between them would have to be settled. Having jurisdiction, and having taken cognizance of the cause, no other court could interpose, notwithstanding the long time elapsed since the decree of sale was made, to do what it could do in the cause commenced by petition.— *Haralson v. Collins*, at this term; *Deadrick v. Smith*, 6 Humph. 138. In *Tally v. Starke's Administrator* (6 Grattan, 339), nearly thirty years had elapsed between a sale under a decree and a confirmation of it by the same court; and in the meantime, the defendant, who died in possession, and subsequent purchasers from his heirs, had occupied and treated the property as their own. Yet, it was held, on confirmation of the sale, that the purchaser's title related back to that time, superseding intermediate conveyances, and that he was entitled to recover the land in an action at law. We refer to this only to show the continuing power of the Probate Court, and not for any other purpose.

But a difficulty arises from the fact that the Court of Probate is not a court of general chancery jurisdiction; and that the court which ordered this sale has no larger capacity of that sort than is conferred on it by the statute. It had power only to make and enforce the sale, and make a distribution of the funds among the several co-owners. But, by its inexpert action, its omission to do its duty correctly and in full, other adversary interests have arisen. By order of the court, the sale was made by, and notes for the purchase-money were taken payable to Thomas F. Flournoy, the administrator; and being permitted to hold them, he has received (it seems) payment of one in full, and transferred the other to a person outside, who has received part payment of the amount of it, and claims to be entitled to the residue. Wherefore, the present complainant, who is a grantee of the land from the original purchaser, of January, 1861, and offers to pay the balance of the purchase-money due, says, in the conflict of claims, she does not know whom to pay. She, therefore, files her bill in the Court of Chancery, makes all the persons in whom the title to the land resides, and the original purchaser from whom she bought, and the

[Todd v. Flournoy's Heirs and Adm'r.]

assignee of his promissory note for half the purchase-money, to whom the administrator transferred it, and Spence, the subsequent administrator *de bonis non, &c.*, parties defendant, and prays the court to determine to which of them the unpaid purchase-money is due, and how much is due to them; and that, upon payment thereof, she may receive a perfect conveyance. This imposes on the chancellor a superintendence also of the trusts created by the will. The case had thus gotten beyond the jurisdiction of the Probate Court, and was properly brought in a court of equity.

The plea that a similar bill, brought by the original purchaser, after he had conveyed all his interest, title and estate to the land in dispute to the complainant in this cause, was formerly dismissed for want of equity, does not prevent his assignee from having an equity, that entitles her to maintain this suit.

What decree should be rendered in this cause will, of course, depend on the pleadings and proof, not yet filed or produced. We may remark, however, that the statute on which this case rests, does not appear to be an act in the administration of an estate of a deceased person. It speaks, it is true, of the legatees (meaning also the devisees) of the estate of Flournoy. It was as such they obtained their interests in common in the property given to them by his will. This was admitted to probate in May, 1849, about eleven years before the act was passed. No mention is made in the act, of executors, or administrators, or of creditors of the deceased, or of a continuing administration. It looks only to a conversion for distribution of the property belonging to testator's children, which had come to them by his will, and of which they were already in possession according to its provisions. The Probate Court received the jurisdiction a Chancery Conrt could exercise to accomplish that object. It was a case between co-owners, which was intrusted to it, and which it was required to dispose of as a Court of Chancery should; and it took control of their property, as such, through its agent, whose authority and power were only such as it conferred on him in that cause—not amplified by, or complicated with any duties or rights that might belong to him as administrator of testator's estate. The description, therefore, among the petitioning devisees and legatees of Thomas F. Flournoy, as administrator *de bonis non* with the will annexed of Marcus A. Flournoy, and also as one of his children and heirs, cannot be understood as meaning that it was in the capacity of administrator he was a party to the petition, but only as indicating that, being such administrator, he had no objection to interpose,

VOL. LVI.

or claim to make of the property for administration, that should prevent the court from proceeding to dispose of it according to the special act, as the property of those among whom, or for whose benefit, the distribution contemplated was to be made. The Probate Court ought, therefore, as a special court of chancery, to have had the proceeds of the sales of the property sold brought into court to be disposed of by it for the benefit of the parties to the cause, according to their several rights under the will, and not have allowed it to be used by the administrator in course of administration. Although the sale was made, by the order of the court, under the direction of the administrator, and the notes taken for the price were made payable to the administrator, this did not give him the property of an administrator in them. He was acting as a commissioner only, of a special court of chancery, and its dealings, and the dealings of others with him, should have been with him in that character. How far the purchaser of the land may have been justified in paying the first note to Thomas F. Flournoy, the administrator, when by order of the court it was made payable to him, it is not necessary now to inquire; but his transfer of the second note to Penn cannot, it would seem, confer on the latter a good title.

The definitive determination, however, of this and other matters, the effect of the consent of the defendants to the proceedings of the administrator, and of their settlement with him in that capacity of accounts in which, as alleged, he charged himself with the amount of such sales—very potent facts in such a case, according to the authorities—and the inquiry what part of the fund should have been disposed of, and how they should have been disposed of for the benefit of the minors, until the youngest should become of age, according to the trust created in their behalf by the will, are things which can be settled only when all the pleadings, and cross-pleadings, and evidence are in, and the cause is submitted for a final decision.

The chancellor erred in dismissing the bill for want of equity; and his order must be reversed, and the cause remanded for further proceedings.